### INTERSTATE COMMERCE COMMIS- SION v. WELDON.

#### Civ. No. 621.

United States District Court
W. D. Tennessee, E. D.

May 18, 1950.

874

Thomas C. Farnsworth, Memphis, Tenn., and Louis I. Dailey, Little Rock, Ark., for plaintiff.

Joseph M. Scanlan, Chicago, Ill., for defendant.

BOYD, District Judge.

The plaintiff, Interstate Commerce Commission, seeks by this action to enjoin defendant from transporting raw shelled peanuts in interstate commerce for compensation, unless and until a proper certificate of public convenience and necessity, required by Part II of Section 206(a) of the Interstate Commerce Act, 49 U.S.C.A. § 306(a), is issued by the Interstate Commerce Commission authorizing him to engage in such an operation and business. This hearing is on plaintiff's motion for summary judgment.

The defendant, Clifton E. Weldon, denies that such a certificate under the Act is necessary for him to transport the peanuts aforesaid, since same are agricultural commodities, or products, within the meaning of the exemption embraced in Section 203(b) (6) of the Act, 49 U.S.C.A. § 303 (b) (6), which is as follows:

"Section 303(b). Nothing in this chapter, except the provisions of Section 304 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include * * *

"(6) motor vehicles used in carrying property consisting of * * * agricultural commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation; * * *".

From the facts, which are stipulated, it appears that plaintiff issued to the defendant, an individual doing business under the trade-name of Argo-Collier Truck Line, of Martin, Tennessee, a certificate of public convenience and necessity, authorizing him as a common carrier by motor vehicle to transport for compensation: "Agricultural products, over irregular routes, from points and places in Mississippi, Alabama, Georgia and Louisiana, to Chicago, Illinois, and points and places in Illinois, within 200 miles of Chicago, with no transportation for compensation on return, except as otherwise authorized".

The defendant is transporting in interstate commerce raw shelled peanuts from shelling plants in Alabama, and Georgia, under the certificate set out above, and, in addition, is transporting this commodity in interstate commerce from such plants in the State of Florida, without a certificate from the Commission.

The parties have stipulated, among other things, that producers bring raw unshelled peanuts from the farm by wagon or truck to shelling plants, where they are sampled, weighed and sold. The peanuts are then shovelled or dumped from the farmers' vehicles into a bin from which they are conveyed into the mill warehouse by spiral elevator, or by suction. The first process is the removal of hay and stems. The peanuts are then moved to another sifting mechanism where nails, peanut picker parts, and small rocks are removed. Afterwards they are conveyed to another part of the plant where the "pops" are blown out. "Pops" are those shells which contain no

meat or kernel. The next process is shelling. The peanuts pass between two large drums which remove the shells, the surfaces of the drums having many slots in which the meat or kernels fall, in order that they will not be completely crushed in passing through the sheller. The kernels are then cleaned and graded into different sizes. The next process is removal of the broken kernels, which are classified as "No. 2's". The kernels then pass over a belt and any imperfect or broken ones are removed by hand by persons employed for that purpose, who are known as "pickers". Finally, the kernels are weighed and placed in bags for shipment. Hay and "pops" are ground in the same plant, mixed with molasses, and sold as feed for cattle. The hulls are ground and used as a filler for peanut meal. Hulls may also be placed directly on the soil, as they contain sulphur and soda and are valuable as fertilizer in their natural state. The plants in which the shelling takes place vary in size and complexity and in value from a minimum of about $75,000.00 to a maximum of about $500,-000.00.

Plaintiff's position is that raw shelled peanuts are not agricultural commodities or products under a proper interpretation of the phrase "agricultural commodities (not including manufactured products thereof)", as set out in Section 203(b) (6) of the Interstate Commerce Act.

Plaintiff, more specifically, contends that the removal of the peanut from the shell by mechanical methods is a manufacturing process after which the peanut has undergone a change which renders it a manufactured item and one which under the exemption of Section 203(b) (6) can not be classified as an "agricultural commodity or product".

The position of the defendant is that the certificate granted him by the Commission clearly authorizes the transportation of raw shelled peanuts in interstate commerce if, indeed, a certificate is required at all and that no additional authority or certificate from the Commission is necessary for him to transport raw shelled peanuts in interstate commerce, since same are agricultural products within the certificate held by him and within the meaning of Section 203(b) (6), the transportation of such peanuts are exempt from regulation under the Act.

The burden is upon the defendant to show his operation comes within the exemption upon which he relies. Walling v. Bay State Dredging & Contracting Co., 1 Cir., 149 F.2d 346, 161 A.L.R. 825, certiorari denied, 326 U.S. 760, 66 S.Ct. 140, 90 L.Ed. 457.

The answer to the question before the Court involves a construction of the language of Section 203(b) (6) of the Interstate Commerce Act to determine whether Congress thereby intended, in the use of the phrase "agricultural commodities (not including manufactured products thereof)" to exclude peanuts of the type here involved as being a manufactured product. If it did, then defendant's certificate aforesaid, authorizing the interstate transportation of "agricultural products" for compensation is not broad enough to cover the interstate transportation of raw shelled peanuts for compensation and the defendant should be enjoined from further transportation of raw shelled peanuts until proper authority is duly applied for and granted him.

The provision of Section 203(b) (6) under consideration is an exemption from the general terms of the statute and as such must be strictly construed. Piedmont & Northern R. Co. v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115.

Of course, it is a primary rule of construction of statutes to ascertain and declare the intention of the legislative body. U. S. v. Cooper Corp., 312 U.S. 600, 606, 61 S.Ct. 742, 85 L.Ed. 1071.

The problem is not entirely free from difficulty, but the Court finds that Congress clearly intended, from the language, to exclude only "agricultural commodities" in their natural state. This seems the only reasonable construction of which the phrase of the exemption in question is susceptible. So, if raw shelled peanuts may be classified as a manufactured commodity, or product, rather than an agri-

cultural commodity or product in its natural state, the interstate transportation of them is subject to the terms of the Act herein.

Under the facts here the producer, or farmer, parts with all of his right, title and interest in the peanuts produced by him on delivery and sale to the shelling plant. There must be a time when peanuts cease to be products of the farm and are considered manufactured articles and it seems appropriate in dealing with the question here involved to say that peanuts are a manufactured product from the time same are sold by the farmer and shelled at the shelling plant.

There would seem to be no good reason to conclude that some later treatment, or process, such as the making of peanut butter or confections should be the criterion in determining when a product of the soil is transformed into a manufactured item. Raw materials may be subject to successive processes of manufacture, each of which is complete in itself, but several of which may be required to make the finished product.

Here the peanuts, after harvesting, are transported to a shelling plant where, by the use of elaborate machinery, the shell is removed, thereby leaving the kernel as one product and the shell as another. The peanut has then undergone its first manufacturing process and is no longer an agricultural commodity but has now been changed into a commercial item ready for its next successive process of manufacture which may include its removal to a crushing plant, where the kernels are further processed into such items as peanut oil and peanut butter.

Incidentally, the Commission, in the case of Harris & Callis Contract Carrier Application, 4 M.C.C., 169-170, which involved the exemption in question here, ruled that ground peanut shells are a manufactured product.

Previous handling of the peanut crop on the farm through harvesting and its incidents are agricultural activities by common acceptance. So, it seems only reasonable to say that the shelling of peanuts is a manufacturing process, or step,

which renders them a manufactured product. Since the parenthetical phrase "not including manufactured products thereof" in the exemption was undoubtedly inserted by Congress to express the limited scope of the term "agricultural commodities", it naturally follows in an interpretation of Section 203(b) (6), that Congress intended to exclude from regulation only vehicles carrying agricultural products in their natural state and not manufactured products.

It must be kept in mind always that the Interstate Commerce Act, 11 U.S.C.A. § 1 et seq., is remedial legislation, requiring a liberal interpretation to effect its evident purpose. Binkley Mining Co. of Missouri v. Wheeler, 8 Cir., 133 F.2d 863-871, certiorari denied, 319 U.S. 764, 63 S.Ct. 1326, 87 L.Ed. 1715.

The Interstate Commerce Commission, charged by law with the administration of the Act, said in the Monark Egg Case, 26 M.C.C., 615-618, in reference to Section 203(b) (6), that "while pecans and walnuts (in the shell) are agricultural commodities, shelled nuts (nut meats) are products resulting from processing beyond that forming a part of the harvesting or ordinary customary in the preparing of the commodities for market by the producer". The Commission further said "that by the use of the words 'agricultural commodities (not including manufactured products thereof)' Congress intended to include those commodities which are marketable in their natural state and those which have been processed to the extent customarily required to place them in a marketable state by the producer".

In a later opinion (Oct. 2, 1944) in the Monark Egg Case, reported in 44 M.C.C., 15, the Commission reviewed the legislative history of Section 203(b) (6) under which it found "the benefits of the exemption were intended for the farmer by affording relief in the transportation of his products to the point where they first enter the ordinary channels of commerce". The Commission also said, in effect, when the farmer, as is his custom, sells his peanuts to the operator of the shelling plant and they have been processed by removal of the shell, the peanut has then entered the

ordinary channels of commerce and the operation performed on it at that point removes it from the class of unmanufactured agricultural commodities which was intended to be designated by the section here under consideration.

The Commission significantly observed in the second Monark Egg Case, supra, also "the problem confronting Congress at the time of the adoption of the exception here in question was to relieve transportation of essential products of agriculture from some of the incidents of regulation and yet preserve the general purpose of the necessary regulation of transportation by motor vehicle".

■ The contemporaneous constructions placed upon the provisions of the Interstate Commerce Act by the Commission which possesses special competence in this field, are entitled to great weight and respect and will not be overturned unless they are arbitrary or plainly erroneous. New York, N. H. & Hartford R. R. Co. v. Interstate Commerce Commission, 200 U.S. 361, 402, 26 S.Ct. 272, 50 L.Ed. 515; Brewster v. Gage, Collector of Int. Revenue, 280 U.S. 327, 336, 50 S.Ct. 115, 74 L.Ed. 457.

■ The Court holds the term "agricultural products" contained in the defendant's certificate of Public Convenience and Necessity, carries the same interpretation as the phrase "agricultural commodities (not including manufactured products thereof)", found in Section 203(b) (6) of the Interstate Commerce Act; that the generic term "agricultural products" used in the defendant's certificate aforesaid and the term "agricultural commodities" appearing in the exemption under consideration, do not embrace the interstate transportation of raw shelled peanuts which are a manufactured product.

The conclusion here expressed precludes the necessity of determining the contention of the Commission that the exemption is lost if the vehicles authorized to transport agricultural commodities are also used to transport nonexempt commodities at other times, for compensation, in interstate commerce, though this question seems to have been settled in Interstate Commerce Commission v. Dunn, 5 Cir., 166 F.2d 116.

Plaintiff's motion for Summary Judgment is sustained and judgment awarding the relief sought will be entered accordingly.