CONSOLIDATED TRUCK SERVICE,
Inc., Plaintiff,

and

Ezra Taft Benson, Secretary of Agriculture of the United States, Intervening Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 2–55.

United States District Court
D. New Jersey.

Sept. 28, 1956.

Cole, Morrill & Berman, Paterson, N. J., for plaintiff.

Harry Ross, Jr., and Walter D. Matson, Washington, D. C., for U. S. Department of Agriculture.

Charles Hoens, Jr., Newark, N. J., Norah C. Taranto, Sp. Asst. Atty. Gen., for the United States.

Bernard A. Gould, New York City, for Interstate Commerce Commission.

William Hays, Winchester, Ky., for Yeary Transfer Co., intervenor.

Joseph H. Blackshear, Gainesville, Ga., for Watkins Motor Lines, Inc., and Louis Patz d/b as Harper Motor Lines, intervenors.

Toolan, Haney & Romond, James P. Haney, Perth Amboy, N. J., for American Trucking Ass'n, intervenor. Fritz R. Kahn, Washington, D. C., of counsel.

Joseph M. Scanlan, Chicago, Ill., for C. E. Weldon, d/b as Argo Collier Truck Lines, intervenor.

Milton, McNulty & Augelli, Anthony T. Augelli, Jersey City, N. J., for Peanut and Nut Salters Ass'n, National Confectioners Ass'n and Peanut Butter Mfg. Ass'n, amici curiae.

Before BIGGS, Circuit Judge, and MODARELLI and HARTSHORNE, District Judges.

BIGGS, Circuit Judge.

The plaintiff, Consolidated Truck Service, Inc., seeks to set aside an order of the Interstate Commerce Commission dated April 13, 1951, entered in a proceeding entitled Determination of Exempted Agricultural Commodities, Docket No. MC–C–968, reported at 52 M.C.C. 511, 537–539, insofar as it relates to certain raw shelled nuts.[1] We have jurisdiction under Sections 1336, 1337, 1346, 1398, 2284, and 2321–2325, Title 28, Section 205(g) of the Interstate Commerce Act, 49 U.S.C.A. § 305(g), and Section 10(e) of the Administrative Procedure Act, 5 U.S.C.A. § 1009(e).

Consolidated is a nation-wide produce hauler, transporting primarily agricultural products. The dispute is whether raw cashew nuts, raw filbert nuts and raw walnuts, all shelled, hauled by Consolidated are agricultural commodities within the purview of Section 203(b) (6) of the Interstate Commerce Act, 49 U.S.C.A. § 303(b) (6). The Commission found that the raw shelled nuts referred to are manufactured products of agricultural commodities and that Consolidated may not transport them without first obtaining a certificate of public convenience and necessity from the Commission. See Section 206, 49 U.S.C.A. § 306. If Consolidated does transport them it and its shippers will incur the penalties prescribed by the statute, the Commission having prohibited the transportation. Consolidated contends that the Commission's action exceeded its authority and that its decision and order of April 13, 1951 declaring the raw shelled nuts to be manufactured products are not supported by substantial evidence or adequate findings, and that the Commission's decision fails to give effect to the congressional purpose of Section 203(b) (6), 49 U.S. C.A. § 303(b) (6).

Section 203(b) (6), 49 U.S.C.A. § 303 (b) (6), exempts "motor vehicles used in carrying * * * agricultural (including horticultural) commodities (not including manufactured products thereof) * * *" from the provisions of Section 206, 49 U.S.C.A. § 306, which requires the interstate carrier by motor vehicle to procure a certificate of con-

---

1. Two Commissioners dissented.

venience and necessity. Should the raw shelled nuts, the subject of this suit, be classified as agricultural commodities or as manufactured products thereof?[2] The pertinent classifications are not defined by the Act.

There is no question but that we have jurisdiction to review the determination and order of the Commission here.[3]

The Supreme Court interpreted Section 203(b) (6) of the Act in East Texas Motor Freight Lines, Inc., v. Frozen Food Express, 1956, 351 U.S. 49, 51, 76 S.Ct. 574, 576. The issue in that case was whether fresh and frozen dressed poultry were within the exemption of Section 203 (b) (6). The Court, after reviewing the legislative history of the section, said: "The exemption of motor vehicles carrying 'agricultural (including horicultural) commodities (not including manufactured products thereof), was designed to preserve for the farmers the advantage of low-cost motor transportation. * * * The victory in the Congress for the exemption was recognition that the price which a farmer obtains for his products is greatly affected by the cost of transporting them to the consuming market in their raw state or after they have become marketable by incidental processing."

The Court went on to say: "It is plain from this change [made in the wording of the Bill by House floor amendment] that the exemption of 'agricultural commodities' was considerably broadened by making clear that the exemption was lost not by incidental or preliminary processing but by manufacturing. * *

The ginned and baled cotton and the cottonseed [admittedly not a manufactured product], as well as the dressed chicken, have gone through a processing stage. But neither has been 'manufactured' in the normal sense of the word. * * *" Id., 351 U.S. at pages 52, 53, 76 S.Ct. at page 576.

■ The Court also stated: "At some point processing and manufacturing will merge. But where the commodity retains a continuing substantial identity through the processing stage we cannot say that it has been 'manufactured' within the meaning of § 203(b) (6).

"The Commission is the expert in the field of transportation. And its judgment is entitled to great deference because of its familiarity with the conditions in the industry which it regulates. * * * But Congress has placed limits on its statutory powers; and our duty on judicial review is to determine those limits. * * * Those limits would be passed here if the Commission were permitted to expand 'manufactured' to include such incidental processing as is involved in dressing and freezing a chicken." Id., 351 U.S. at page 54, 76 S.Ct. at page 577.

The four dissenting Justices in the East Texas Lines case emphasized the limitations imposed on judicial power in reviewing administrative action, but the case at bar, like the East Texas Lines case, involves more than a mere determination of whether the findings of the Commission are correct. The question presented is one of mixed law and fact

2.  Section 203(b) (6) provides:
    "Nothing in this part, except the provisions of section 204 relative to qualifications and maximum hours of service of employees and safety of operation or standards of equipment shall be construed to include * * * motor vehicles used in carrying property consisting of ordinary livestock, fish (including shell fish), or agricultural (including horticultural) commodities (not including manufactured products thereof), if such motor vehicles are not used in carrying any other property, or passengers, for compensation * * *."

3.  The Supreme Court has determined this issue. See Frozen Food Express v. United States, 1956, 351 U.S. 40, 43–44, 76 S.Ct. 569, 571. The Court stated: "The determination by the Commission that a commodity is not an exempt agricultural product has an immediate and practical impact on carriers who are transporting the commodities, and on shippers as well. The 'order' of the Commission warns every carrier, who does not have authority from the Commission to transport these commodities, that it does so at the risk of incurring criminal penalties."

and our decision must be based on a consideration of the whole record. See Section 10 of the Administrative Procedure Act, 5 U.S.C.A. § 1009(e).

The *substantial identity* test of the East Texas Lines decision is in keeping with the Commission's own determination that ginned cotton and pasteurized milk are not manufactured products albeit the legislative history of Section 203 (b) (6), 49 U.S.C.A. § 303(b) (6), could permit of no other decision. See 52 M.C.C. 511, 523–524, 551. In the case at bar the Commission takes the position, as it must, that it is in agreement with the substantial identity test laid down by the Supreme Court but maintains nonetheless that the raw shelled nuts do not retain a continuing substantial identity with the raw unshelled nuts.

The Commission relies heavily on Interstate Commerce Commission v. Weldon, D.C.W.D.Tenn.1950, 90 F.Supp. 873, affirmed 6 Cir., 1951, 188 F.2d 367, certiorari denied, 1951, 342 U.S. 827, 72 S. Ct. 50, 96 L.Ed. 625. In that case the Commission sought to enjoin Weldon from transporting raw shelled peanuts in interstate commerce despite the fact that he had a certificate authorizing him to transport "agricultural products." The Commission contended that the removal of the peanuts from the shell rendered them manufactured products and that therefore they were not included in the certificate already granted to Weldon. Weldon asserted that raw shelled peanuts are agricultural products within the meaning of Section 203(b) (6). In granting the Commission's motion for summary judgment the trial court concluded that Congress intended "to exclude only 'agricultural commodities' in their natural state." The court also laid emphasis on the mechanical means employed in shelling and cleaning the raw peanuts and pointed out that title to the peanuts passed prior to the transportation and that they had entered the "channels of commerce" at the time of processing. The passage of title at the time indicated and the entry of the nuts into the channels of commerce do not seem to us to be factors relevant to the issue of identity. Moreover the "channels of commerce" theory has now been rejected by the Commission, 52 M.C.C. 511, 524, 525 (1951), and by the courts. See Interstate Commerce Commission v. Yeary Transfer Co., Inc., D.C.E.D.Ky.1952, 104 F.Supp. 245, affirmed 6 Cir., 1953, 202 F.2d 151. Nor do we think employment of machinery to shell and cleanse the raw peanuts can fairly be described as manufacturing. We do not find the Weldon decision persuasive.[4]

We cannot agree with the Commission's contentions that the raw shelled nuts are manufactured products of agricultural commodities. The Supreme Court in its East Texas Lines decision emphasized the fact that the farmer won a victory in Congress by the enactment of Section 203(b) (6), 49 U.S.C.A. § 303 (b) (6), and that the enactment was recognition of the fact that the price obtained by the farmer for his product is greatly affected by the cost of transporting it to the market whether in its raw state or after it has become marketable by incidental processing. True, the raw shelled nut can be shipped at a lower cost but that has nothing to do with its continuing substantial identity to a raw unshelled nut. Moreover, the raw shelled nut frequently remains viable, a living seed. Seemingly it suffers no substantial change by the divestiture of its natural outer covering, essential for its growth but, insofar as mankind is concerned,

4. The Court of Appeals for the Sixth Circuit affirmed the Weldon decision "upon the grounds and for the reasons set forth in the memorandum opinion of the District Court * * *". But it would appear from uncontradicted statements made to us in open court that in the oral argument before the Court of Appeals Weldon abandoned his contention that the raw shelled peanuts were an unmanufactured agricultural commodity and that the Court of Appeals therefore did not have this issue before it.

serving no other purpose. Indeed the husk or shell, when removed, has little value for it can be used only as fertilizer or as feed for livestock.[5] If an eviscerated chicken retains a substantial identity to a chicken in the pen, we think that it must be said that a raw shelled nut is substantially identical to a raw unshelled nut. Cf. Home Transfer & Storage Co. v. United States, D.C.W.D.Wash.1956, 141 F.Supp. 599. We conclude that the raw shelled nuts are not manufactured products within the terms of the statute.

■ Objection has been made to the intervention of the Secretary of Agriculture, as a party plaintiff, and also to the fact that the United States, a statutory defendant, strongly supports Consolidated's position. The intervention of the Secretary of Agriculture as a party plaintiff is authorized by 7 U.S.C.A. § 1291 and 28 U.S.C. § 2323. See also Secretary of Agriculture v. United States, 1954, 347 U.S. 645, 647, 74 S.Ct. 826, 98 L.Ed. 1015. Support for the position of the United States is found in Frozen Food Express v. United States and East Texas Motor Freight Lines, Inc. v. Frozen Food Express, supra. We can perceive no reason why a Department or a Cabinet Officer, charged with duties of decision by Congress may not express views in accordance with judgment and conscience. The writ of Mark, iii, 25 does not run in this case.

The order of the Commission will be enjoined and set aside insofar as it relates to the raw shelled nuts, the subject of this controversy.

All petitions for intervention as party to the suit will be allowed.

An order may be submitted.

5. The Commission insists that the nut is the whole; outer shell, inner kernel covering, and the kernel itself; that, in effect, on the shelling and on the removal of the inner kernel covering, there is a manufactured product. The Commission insists that the kernel is not the *nut*. We agree that the kernel is not the exact object that came from the plant. But we are not concerned with exactitude but with the test of substantial identity.

Findings of fact and conclusions of law, supplementing those set out herein, will be filed with this opinion. See Fed. R.Civ.P. 52(a), 28 U.S.C.

When you have an egg for breakfast, you do not eat the shell.

Judge Hartshorne cogently put this issue in another way during the course of the oral argument as follows: "The law is made for man. * * * It is the substantial identity of the article from the standpoint of man, here the consumer, which should be the criterion." See T. p. 80.