**SEATRAIN LINES, Inc., Plaintiff,**
v.
**UNITED STATES of America,**
**Defendant,**
and
**Interstate Commerce Commission and**
**Pan-Atlantic Steamship Corporation,**
**Intervening Defendants.**

**Civ. A. No. 1847.**

United States District Court
D. Delaware.

May 23, 1957.

Daniel O. Hastings, of Hastings, Lynch & Taylor, Wilmington, Del., S. S. Eisen, New York City, and Raoul Berger, Washington, D. C., for plaintiff.

Victor R. Hansen, Asst. Atty. Gen., James E. Kilday and John H. D. Wigger, Washington, D. C., and Leonard G. Hagner, U. S. Atty., Wilmington, Del., for the United States.

Robert W. Ginnane, Gen. Counsel, and H. Neil Garson, Asst. Gen. Counsel, Washington, D. C., for Interstate Commerce Commission.

Aaron Finger, of Richards, Layton & Finger, Wilmington, Del., William H. Armbrecht, Jr., Mobile, Ala., and Warren Price, Jr., Washington, D. C., for Pan-Atlantic S. S. Corp.

Before MARIS, Circuit Judge, and RODNEY and WRIGHT, District Judges.

CALEB M. WRIGHT, District Judge.

This is an action brought under 28 U.S.C. Sections 1336, 1398, 2201, 2284, and 2321 to 2325 inclusive, to restrain, enjoin, set aside and annul an order of the Interstate Commerce Commission (hereafter referred to as the Commission), or to obtain a declaratory judgment that such order is unlawful and invalid. Pan-Atlantic Steamship Corporation (hereafter referred to as Pan-Atlantic), is a common carrier by water which holds a certificate from the Commission authorizing it to transport passengers and commodities generally between specified Atlantic and Gulf ports. Plaintiff, Seatrain Lines, Inc. (hereafter referred to as Seatrain), is a common carrier by water authorized by the Interstate Commerce Commission to trans-

port commodities generally in interstate and foreign commerce between specified ports, some of which are the same ports at which Pan-Atlantic is authorized to call.

The Commission order under attack granted to Pan-Atlantic the right to carry in truck trailers or containers as deck loads on converted tankers, the general commodities its certificate issued by the Commission authorizes it to transport along with bulk petroleum without subjecting the bulk petroleum to regulation. The transportation of bulk petroleum alone in a given vessel is exempt under Section 303(d) of the Interstate Commerce Act, 49 U.S.C.A. § 903(d). However, when bulk petroleum is carried in a vessel which also carries regulated dry cargo, the bulk petroleum is subject to regulation unless an exemption order such as that under attack is obtained from the Commission.

Seatrain operates specially designed vessels for the carriage of dry cargo. Each of these vessels also contains ten large side tanks with a capacity equivalent to more than one-third of the carrying capacity of each vessel. Prior to July 14, 1949, this capacity was not utilized because Seatrain was unable to compete for bulk petroleum on equal terms with exempt tank vessel carriers[1] while any bulk petroleum it proposed to carry remained subject to regulation. This inability to compete was rectified in July, 1949 when the Commission, pursuant to 49 U.S.C.A. § 903(e) (2), exempted from regulation Seatrain's transportation of bulk petroleum when such transportation was combined in the same vessel with the transportation of general commodities.

In the summer of 1955, Pan-Atlantic complemented its fleet of conventional C-2 type dry cargo vessels with the acquisition of T-2 type tankers. These tankers were subsequently equipped with cargo decks to permit the transportation thereon of containers and truck trailers. As a consequence, Pan-Atlantic found itself in a position analogous to that of Seatrain prior to the order of the Commission granting Seatrain an exemption from regulation of the bulk petroleum when carried with dry cargo on the same vessel. Accordingly, by application filed with the Commission on August 22, 1955, Pan-Atlantic sought the same exemption on virtually the identical petroleum products granted to Seatrain in 1949. This application for exemption was opposed by Seatrain and certain Southern and Southwestern railroads.

On July 3, 1956, Division 4 of the Commission issued an order exempting from regulation transportation by Pan-Atlantic of bulk petroleum from the provisions of Part III of the Interstate Commerce Act, 49 U.S.C.A. § 901 et seq., when carried on the same vessel with dry cargo. The exemption order relates only to bulk petroleum and does not affect the cargo to be carried on the spar decks of the converted T-2 tankers. The deck cargo, even when transported on the converted tankers with the exempt bulk petroleum will be carried at published tariff rates, and will be subject to regulation by the Commission just as it is when carried by conventional cargo vessels.

Seatrain petitioned for reconsideration of the Commission order. This petition was denied on September 20, 1956 and the Commission made the Division 4 order effective as of October 22, 1956. On October 16, 1956, Seatrain instituted this action. The railroad protestants before the Commission did not join Seatrain in its prosecution of this action.

Seatrain does not urge the Commission exceeded its statutory authority under the Interstate Commerce Act in the exercise of its discretion in the grant of the exemption. Rather, the Commission order is attacked because of alleged lack of jurisdictional findings that the exemption was consistent with the National

1. 49 U.S.C.A. § 903(d).

Transportation Policy and because the exemption allegedly renders discrimination possible and is therefore contrary to the public interest and the National Transportation Policy, 49 U.S.C.A. note, preceding Section 901.

Pan-Atlantic challenges the right of Seatrain to bring this action. Therefore, before the validity of the order may be considered, it must first be determined whether plaintiff has standing to maintain this suit.

■ Seatrain would circumvent any question of standing by seeking to find an unqualified right to bring this action. This unqualified right would first be found on the theory that intervention by Seatrain in the Commission hearing on the Pan-Atlantic application conferred on Seatrain the right to bring this action. Early in the history of the law of standing there was an implication that intervention before the Commission conferred standing upon one to institute an action to challenge the order of the Commission.[2] This implication has been completely and utterly destroyed by later pronouncements of the Supreme Court. In Pittsburgh & W. Va. Ry. v. United States, 1930, 281 U.S. 479, 486, 50 S.Ct. 378, 381, 74 L.Ed. 980, where the District Court based its conclusion that plaintiff had standing partially upon the fact that plaintiff had intervened before the Commission, the Court in reversing the District Court, said: "The mere fact that appellant was permitted to intervene before the Commission does not entitle it to institute an independent suit to set aside the Commission's order in the absence of

resulting actual or threatened legal injury to it * * *." Accord: Moffat Tunnel League v. United States, 1933, 289 U.S. 113, 53 S.Ct. 543, 77 L.Ed. 1069; Sprunt & Son v. United States, 1930, 281 U.S. 249, 50 S.Ct. 315, 74 L.Ed. 832; Atchison, Topeka & Santa Fe Ry. Co. v. United States, D.C.E.D.Mo.1955, 130 F.Supp. 76, affirmed, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, rehearing denied, 1956, 350 U.S. 943, 76 S.Ct. 299, 100 L.Ed. 822.

■ A second basis advanced by Seatrain in support of its right to maintain this action is that after relief is denied at a rehearing of the Commission, the statute confers an unqualified right to bring an action in the appropriate court. A reading of the applicable statutory provision, 49 U.S.C.A. § 17(9) [3] reveals that the provisions of law applicable in the case of suits to enforce, enjoin, suspend or set aside orders of the Commission govern the right to bring this action. In order to proceed under these applicable provisions of law, plaintiff must first establish its standing to use those provisions. The statutory provisions do not confer this right.

■ In order to determine whether Seatrain has standing, the exact nature of the interest of Seatrain in the exemption order must first be ascertained. This interest must be found in the record, specifically, the complaint and the affidavit accompanying Seatrain's motion for a temporary restraining order.[4]

The complaint charges the exemption order of the Commission is invalid and unlawful in that: (1) the Commission declined to consider or make findings as

2. Chicago Junction Case, 1924, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667.

3. 49 U.S.C.A. § 17(9).
   "(9) When an application for rehearing, reargument, or reconsideration of any decision, order, or requirement of a division, an individual Commissioner, or a board with respect to any matter assigned or referred to him or it shall have been made and shall have been denied, or after rehearing, reagument, or reconsideration otherwise disposed of, by the Commission or an appellate division, a suit to enforce, enjoin, suspend, or set aside such decision, order, or requirement, in whole or in part, may be brought in a court of the United States under those provisions of law applicable in the case of suits to enforce, enjoin, suspend, or set aside orders of the Commission, but not otherwise."

4. The motion for a temporary restraining order was denied.

to whether the exemption would promote adequate service and foster sound economic conditions in transportation and among the several carriers as is required by the National Transportation Policy,[5] (2) the Commission action was arbitrary and capricious and constitutes an abuse of discretion, because the exemption permits the transportation of exempt and regulated freight in a combined dual-operation, creating opportunity for undue and unlawful discrimination, preference and prejudice, contrary to the public interest, the National Transportation Policy and the policy of the Interstate Commerce Act,[6] (3) the Commission failed to make findings relating to the charge that the exemption poses the threat of rate wars and the concomitant dissipation of carrier revenues which would be harmful to the economic stability of national transportation and therefore, contrary to the National Transportation Policy,[7] and (4) the Commission erroneously refused to grant a rehearing to consider a radical shift in the facts which had taken place since the hearing and which altered the future competitive impact of the exemption on existing common carrier services.[8]

Nowhere in the complaint is there an allegation Seatrain is in any manner adversely affected or subjected to injury of any nature or type. The most Seatrain urges in the complaint is the public interest in enforcement of the Interstate Commerce Act and the National Transportation Policy was not served when the Commission granted the exemption order. In order to have standing, the Complainant must possess something more than a common concern for obedience to law. See: Com. of Massachusetts v. Mellon, 1923, 262 U.S. 447, 43 S. Ct. 597, 67 L.Ed. 1078. The complaint, considered alone, does not confer standing upon plaintiff to prosecute this action.

If standing is to be found, it must arise from allegations contained in the affidavit of an officer of Seatrain.[9] The gist of the affidavit is that Pan-Atlantic has taken certain measures which place Seatrain at a substantial competitive disadvantage. The first measure complained of is Pan-Atlantic, in anticipation of receiving the exemption, has instituted a policy of absorbing the cost of marine insurance in the published freight rates and charges on rail-water-rail service of dry cargo shipped on converted T-2 type tankers. This insurance charge has traditionally been borne by the shippers or receivers. Consequently, Seatrain has suffered a loss of revenue resulting from a diversion of traffic from Seatrain. It is further alleged, if Seatrain is to meet this competitive disadvantage, it will have to include marine insurance in its rail-water-rail rate structure at a cost of approximately $80,000 per annum in increased operating expense.

The second measure complained of is "that in anticipation of obtaining said exemption, which makes possible the subsidy of the general freight operation by the handling of bulk petroleum, Pan-Atlantic Steamship Corporation published, and continues to maintain rates lower than the rates maintained by Seatrain Lines, Inc. * * *", thereby causing an actual diversion of traffic from Seatrain to its irreparable damage.[10]

A third measure complained of is further proposed rate reduction by Pan-Atlantic to a level below that of Seatrain, causing either a further diversion of traffic from Seatrain or requiring Seatrain, if it is to maintain competitive equality, to reduce its rates to the level proposed by Pan-Atlantic, in consequence of which its revenues will be diminished to its irreparable detriment.

---

5. Complaint, Sec. 11(a).

6. Complaint, Par. 11(b).

7. Complaint, Par. 11(c).

8. Complaint, Par. 11(d).

9. See note 4. The affidavit accompanied a motion for a temporary restraining order.

10. Affidavit of Harry Johnson, Par. 8. An example of representative movements contained in the affidavit alleged a loss of revenues of $140,271.

Finally, the affidavit alleges Pan-Atlantic is planning to acquire additional capacity which will correspondingly increase the diversion from Seatrain. As a consequence, Seatrain is reluctant to acquire new vessels because of the competitive situation. This reluctance has resulted in an estimated loss of $6,000 in revenue per day per projected vessel. This final allegation does not support standing in plaintiff. At most, it decries the difficulty of making a business decision by reason of the exemption order and alleges future losses of an entirely too speculative nature.

The question becomes one of determining whether actual and prospective diversion of traffic from Seatrain with concomitant loss of revenue caused by actual and proposed rate reductions and absorption of marine insurance charges,[11] confers standing upon plaintiff to attack the exemption order.

No case has been cited nor has research revealed any decision of the Supreme Court treating standing to attack an Interstate Commerce Commission exemption order. In situations where standing to attack Commission orders has been treated, the particular order under attack concerned adjustment in rates affecting shippers [12] or the grant of new operating rights so as to increase competition for traffic among carriers, [13] or the acquisition in some form of one carrier by another thereby changing the competitive situation for other car-

---

11. The allegation that the exemption order enables Pan-Atlantic to absorb without cost to itself, marine insurance charges on the regulated dry cargo which heretofore had been borne by shippers and receivers is nothing but a complaint about rates set by Pan-Atlantic. The only difference is that instead of alleging the setting of a lower rate, it is charged Pan-Atlantic provides more services for the same rate in the form of absorption of insurance charges. Therefore, the entire affidavit for purposes of this standing discussion will be viewed as a charge that the exemption order has enabled Pan-Atlantic to have a favorable rate structure on regulated dry cargo resulting in a diversion of traffic from Seatrain.

12. Youngstown Sheet & Tube Co. v. United States, 1935, 295 U.S. 476, 55 S. Ct. 822, 79 L.Ed. 1553: standing found to permit a shipper to attack an ICC order establishing minimum rates so as to equalize a competitive geographical advantage accruing to certain shippers by reason of new found availability of water transportation; Sprunt & Son v. United States, 1930, 281 U.S. 249, 50 S. Ct. 315, 74 L.Ed. 832: standing denied a shipper to attack a rate order which erased a competitive advantage existing by reason of a prior rate structure; Edward Hines, Yellow Pine Trustees, v. United States, 1923, 263 U.S. 143, 44 S. Ct. 72, 68 L.Ed. 216: standing denied a shipper to attack an order removing a penalty demurrage charge.

13. Atchison, Topeka & Santa Fe Ry. Co. v. United States, D.C.E.D.Mo.1955, 130 F.Supp. 76, affirmed, 1955, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785, rehearing denied, 1956, 350 U.S. 943, 76 S.Ct. 299, 100 L.Ed. 822: standing denied a railroad where the order permitted joinder of motor carriers which might result in stronger competition, but did not involve a grant of new operating rights; Alton Railroad Co. v. United States, 1942, 315 U.S. 15, 62 S.Ct. 432, 86 L.Ed. 586: railroads held to have standing to attack an order granting a specialized motor carrier a certificate of public convenience and necessity to serve the same areas serviced by the railroads; Claiborne-Annapolis Ferry Co. v. United States, 1932, 285 U.S. 382, 52 S.Ct. 440, 76 L.Ed. 808: Ferry Company held to have standing when effect of the order was to grant new operating rights to another ferry to serve some of the same areas theretofore handled by plaintiff Ferry Company.

14. Pittsburgh & W. Va. Ry. Co. v. United States, 1930, 281 U.S. 479, 50 S.Ct. 378, 74 L.Ed. 980: standing denied since order could not affect plaintiff in its carrier status (alternative holding); Chicago Junction case, 1924, 264 U.S. 258, 44 S.Ct. 317, 68 L.Ed. 667: carrier had standing where the order resulted in a diversion of traffic from it.

15. Home Furniture Company v. United States, 1926, 271 U.S. 456, 46 S.Ct. 545, 70 L.Ed. 1033: shipper denied standing where order permitting acquisition had the effect of depriving the shipper of service of a competitive line.

riers,[14] shippers,[15] or other interested parties.[16]

Under recent pronouncements of the Supreme Court, a sufficient showing of detriment to Seatrain has been made to confer standing upon it to challenge the order for alleged lack of jurisdictional findings. In Federal Communications Commission v. Sanders Brothers Radio Station, 1940, 309 U.S. 470, 60 S.Ct. 693, 696, 84 L.Ed. 869, the question was whether a rival station, which would suffer economic injury by the grant of a license to another station, had standing to appeal under the terms of the Act. The court held the "resulting economic injury to a rival station is not, in and of itself and apart from considerations of public convenience, interest or necessity, an element the petitioner [FCC] must weigh, and as to which it must make findings, in passing on an application for a broadcasting license." The court further held petitioner had the requisite standing. In so holding the court pointed out "that while a station license was not a property right, and while the Commission was not bound to give controlling weight to economic injury to an existing station consequent upon the issuance of a license to another station, yet economic injury gave the existing station standing to present questions of public interest and convenience by appeal from the order of the Commission." Federal Communications Commission v. National Broadcasting Company, 1943, 319 U.S. 239, 247, 63 S.Ct. 1035, 1038, 87 L.Ed. 1374.

The principle that the person with standing represents the public interest and not his own private interest is es-tablished by Federal Communications Commission v. Sanders Brothers Radio Station, supra, as later modified and clarified by Scripps-Howard Radio v. Federal Communications Commission, 1942, 316 U.S. 4, 62 S.Ct. 875, 86 L.Ed. 1229, and Federal Communications Commission v. National Broadcasting Company, supra. However, in order to avoid clogging of the Courts by reason of mass vindication of the public interest by anyone who might be so inclined, and because of the constitutional requirement of "case or controversy", the one bringing suit must also show personal injury of a substantial character in order to have standing to institute the action. Therefore, as was demonstrated in Sanders, the interest asserted on the appeal from the Commission order may very well be different from that which confers standing to appeal.[17]

Applying these general principles to this litigation, it becomes clear Seatrain has the requisite standing to attack the exemption order. Seatrain has alleged injury of a substantial character in the form of actual and projected losses of revenue due to the rate structure of Pan-Atlantic. Seatrain does not seek in this action a declaration that such rates are unjustified. Rather, it seeks to protect the public interest by having the Commission base its decision upon findings under the National Transportation Policy.

Such a procedure is not without precedent in cases involving standing to attack orders of the Interstate Commerce Commission. In Alleghany Corp. v. Breswick & Co. (Interstate Commerce Commission), 77 S.Ct. 763, a case involv-

---

16. Moffat Tunnel League v. United States, 1933, 289 U.S. 113, 53 S.Ct. 543, 77 L.Ed. 1069: unincorporated associations who feared acquisition would lessen the possibility of the building of an extension to serve their membership denied standing (alternative holding). See also: L. Singer & Sons v. Union Pacific Railroad Co., 1940, 311 U.S. 295, 61 S.Ct. 254, 85 L.Ed. 198: standing denied commission merchants to enjoin building of railroad extension even though railroad did not have necessary permission from ICC; and Western Pacific Cal. R. Co. v. Southern Pacific Co., 1931, 284 U.S. 47, 52 S.Ct. 56, 76 L.Ed. 160: standing granted to a competitor carrier where attack was based partially upon the failure to obtain a commission order.

17. See generally, "Standing to Challenge Governmental Action" by Kenneth Culp Davis, 39 Minn.L.R. 353 (1955).

ing standing to attack an order of the Interstate Commerce Commission, the Supreme Court found standing on the basis of a threatened financial injury stemming from dilution of plaintiff's interest in a corporation. As a consequence, standing was found to attack a status order, even though such standing would probably have been lacking if only the status order were being attacked.[18] As the status order was the causal source of the order which made possible the threatened injury to plaintiff in Alleghany Corp. v. Interstate Commerce Commission, supra, so in an analogous fashion, the causal source of Seatrain's injury is the exemption order.[19]

█ The attack on the Commission order is predicated upon the alleged failure of the Commission to consider the National Transportation Policy and to make findings that the exemption was consistent with the National Transportation Policy. Two questions are raised: (1) did the Commission consider the National Transportation Policy in granting the exemption order, and (2), if the Commission did not consider the National Transportation Policy, was it required to do so when granting an exemption order under 49 U.S.C.A. § 903 (e) (2).

An examination of the Report of Division 4 of the Commission [20] indicates the Commission did not consider the National Transportation Policy.[21] The report of the Commission states Seatrain "fears that the transportation of exempt and regulated cargo by applicant in the same vessels  *  *  *  may result in discriminatory practices contrary to the public interest." While the report of the Commission conclusively shows Seatrain raised this issue, the Commission expressly declined to consider it and limited itself to one issue as follows:

"The sole issue before us here is to determine whether the transportation by applicant as a contract carrier, which by reason of the inherent nature of the commodities transported, their requirement of special equipment, or their shipment in bulk, is not actually and substantially competitive with transportation by any common carrier subject to part I, II, or III. If this question is answered in the affirmative, under the provisions of section 303(e) (2) (49 U.S.C.A. § 903(e) (2))* of the

---

18. See: Breswick & Co. v. United States, D.C.1956, 138 F.Supp. 123, 131–132.

19. In Alleghany Corporation v. Breswick & Co. (Interstate Commerce Commission), 77 S.Ct. 763, 768, minority common stockholders of Alleghany Corporation brought an action before a three-judge District Court to require the Commission to set aside its order granting Alleghany the status of a "non-carrier to be 'considered as a carrier' " and its subsequent order approving a new class of preferred stock, and to restrain Alleghany from issuing the new preferred stock.

In discussing the contention of Alleghany that the minority stockholders had no standing to attack the Commission orders, the Court states:

"The appellees are common stockholders of Alleghany. The new preferred stock issue approved by the Commission is convertible, and under approved notions of standing, the threatened 'dilution' of the equity of the common stockholders provided sufficient financial interest to give them standing. See Ameri-

can Power & Light Co. v. S. E. C., 325 U.S. 385, 388–389, 65 S.Ct. 1254, 89 L.Ed. 1683.

"Having acquired standing to institute proceedings in the District Court by virtue of the threatened financial injury, appellees could also attack the order of the Commission conferring on Alleghany the status of a person not a carrier but to be 'considered as a carrier.' The status order was a source of the threatened financial injury. If the Commission acted out of bounds in decreeing its status order, it had no power to approve the new preferred stock issue and the plaintiffs would be entitled to relief."

20. No. W-376 (Sub-No. 14), decided July 3, 1956.

21. However, the absence of destructive competition within the meaning of the National Transportation Policy was incidental to a finding of absence of substantial competition within the meaning of 49 U.S.C.A. § 903(e) (2).

act, we are authorized to exempt by order from the provisions of part III such of the transportation engaged in by applicant as we find necessary to carry out the therein declared policy of Congress. In the circumstances there is no occasion in this proceeding for determining issues relative to discrimination, dual operations under section 310 of the act, or forfeiture of dormant operating authorities." * (Insertion added.)

The issue as framed by the Commission is in the language of 49 U.S.C.A. § 903 (e) (2).[22] The narrow statement of the issue in conjunction with the declaration that there was "no occasion * * * for determining issues relative to discrimination", establishes the Commission did not consider the National Transportation Policy.

This conclusion is not altered by the following language found in the opening paragraph of the Commission report: "Exceptions and requested findings not discussed in this report nor reflected in our findings or conclusions have been given consideration and are found not justified." If the Commission report were to indicate other alleged necessary criteria and findings were considered, such all embracive language would be curative.[23] However, in the instant report, the Commission negated its consideration of all questions except "whether the transportation by applicant as a contract carrier, which by reason of the inherent nature of the commodities

transported, their requirement of special equipment, or their shipment in bulk, is not actually and substantially competitive with transportation by any common carrier subject to part I, II, or III. * * * " Under this circumstance, the record shows the Commission did not consider those various aspects of the National Transportation Policy which were raised and asserted to be of manifest importance.

Whether the Commission had to make jurisdictional findings under the National Transportation Policy when granting an exemption to a carrier under Section 903(e) (2) is a question of first impression. If one were to accord a literal reading to the National Transportation Policy, remand to the Commission would be necessary because the last sentence of the National Transportation Policy provides: "All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy." If "all" means "all", the Commission erred by reason of its failure to make jurisdictional findings under the National Transportation Policy.

An examination of the Water Carriers Act,[24] particularly 49 U.S.C.A. § 903(b), (c) and (d), reveals "all", as employed in the National Transportation Policy, means something less than "all". These provisions provide for exemption from regulation without regard to the National Transportation Policy. It is not for this court to say it would be better policy to grant the Commission authority to

22. The pertinent portion of 49 U.S.C.A. § 903(e) (2) is as follows:

"(2) It is declared to be the policy of Congress to exclude from the provisions of this chapter, in addition to the transportation otherwise excluded under this section, transportation by contract carriers by water which, by reason of the inherent nature of the commodities transported, their requirement of special equipment or their shipment in bulk, is not actually and substantially competitive with transportation by any common carrier subject to this chapter or chapter 1 or 8 of this title. Upon application of

a carrier, made in such manner and form as the Commission may by regulations prescribe, the Commission shall, subject to such reasonable conditions and limitations as the Commission may prescribe, by order exempt from the provisions of this chapter such of the transportation engaged in by such carrier as it finds necessary to carry out the policy above declared * * *."

23. County Board of Arlington County, Va. v. United States, D.C.E.D.Va.1951, 101 F.Supp. 328.

24. 49 U.S.C.A. §§ 901–923.

determine whether proposed exemptions are inimical to the National Transportation Policy. It suffices that Congress has decided such a Commission determination is not necessary for enjoyment of these exemptions. If the applicant otherwise qualifies, the Commission cannot withhold these exemptions by reason of operating rights under the exemptions being contrary to the National Transportation Policy. By reason of the statute itself, the National Transportation Policy need not, and indeed, cannot be considered in connection with every exemption.

Since the National Transportation Policy does not control enjoyment of all exemptions under Section 903, what is there to indicate this Policy was to be taken into acount in the grant of the exemption to Pan-Atlantic under Section 903(e) (2)? Plaintiff argues unless an exemption by its terms is clearly insulated from consideration by the Commission in terms of the National Transportation Policy, the grant of the exemption must be in agreement with the stated aims of the National Transportation Policy. By way of illustration, plaintiff urges the Court to compare Section 903 (e) (1) with Section 903(e) (2).

49 U.S.C.A. § 903(e) (1) provides:

"(e) (1) Notwithstanding any provision of this chapter the Commission may, by order, from time to time, upon application, or upon its own initiative without application, exempt from the requirements of this chapter the transportation of passengers between points in the United States by way of a foreign port or ports, upon a finding that application of such requirements thereto is not necessary to carry out the national transportation policy declared in this chapter and chapters 1, 8 and 13 of this title."

49 U.S.C.A. § 903(e) (2) insofar as here pertinent provides:

"(2) It is declared to be the policy of Congress to exclude from the provisions of this chapter, in addition to the transportation otherwise excluded under this section, transportation by contract carriers by water which, by reason of the inherent nature of the commodities transported, their requirement of special equipment or their shipment in bulk, is not actually and substantially competitive with transportation by any common carrier subject to this chapter or chapter 1 or 8 of this title. Upon application of a carrier, made in such manner and form as the Commission may by regulations prescribe, the Commission shall, subject to such reasonable conditions and limitations as the Commission may prescribe, by order exempt from the provisions of this chapter such of the transportation engaged in by such carrier as it finds necessary to carry out the policy above declared * * *."

Plaintiff urges the language of Section 903(e) (1), "Notwithstanding any provision of this chapter" is so strong as to have caused Congress to fear the exemption would be insulated from the National Transportation Policy. In order to avoid this result plaintiff states Congress brought the exemption back within the coverage of the National Transportation Policy by virtue of the last clause of Section 903(e) (1). Plaintiff then argues that the language of Section 903(e) (2), "It is declared to be the policy of Congress to exclude from the provisions of this chapter" is so weak when compared with the opening language of Section 903(e) (1), that Congress could not have meant to eliminate all consideration of the National Transportation Policy since it knew how to do so as shown by the beginning language of Section 903(e) (1). This argument is not convincing.

The Act provides for absolute exemptions[25] and qualified exemptions.[26] Exemptions are absolute in the sense that carriers may operate free from Commis-

---

25. 49 U.S.C.A. § 903(b), (c) and (d).

26. 49 U.S.C.A. § 903(e) (1), (e) (2) and (g).

sion regulation or scrutiny if specified conditions are satisfied. Exemptions are qualified in the sense that the Commission by order can create an exemption [27] or remove an otherwise existing exemption.[28] With respect to each type of qualified exemption, Congress has spelled out the basis upon which such exemption is to be extended or withdrawn by Commission order. Whether a carrier operates under a 903(e) (1) exemption or a 903(g) exemption is dependent upon whether operation under such an exemption would be consistent with achievement of the aims of the National Transportation Policy. On the other hand, in Section 903(e) (2) no mention is made of the National Transportation Policy. Rather, the basic consideration is whether transportation by contract carrier is actually and substantially competitive with transportation by any carrier subject to the water, rail or motor provisions of the Interstate Commerce Act. If it is found such transportation is not substantially competitive, either by reason of the inherent nature of the commodities transported, their requirement of special equipment or their shipment in bulk, the Commission may exempt so much of such transportation as is necessary to accomplish the stated policy of Congress to exclude such transportation from regulation.

Stated differently, the exemption provisions found in 49 U.S.C.A. § 903 are nothing more than legislative policy determinations that the ends of National Transportation would best be served either by non-regulation in all instances,[29] by non-regulation except where necessary to carry out the stated ends of the National Transportation Policy,[30] or by non-regulation where there is absent substantial competition with regulated carriers for any one of three reasons.[31]

With respect to certain of the exemptions the Commission has no power to grant or withhold them.[32] But where the statute does empower the Commission to grant or withhold an exemption,[33] it also spells out the considerations upon which that power should be exercised. These considerations vary with the type of exemption. If the Commission were to exercise its power and grant or withhold an exemption upon a consideration other than that stated in the statute in relation to any particular exemption, the Commission would have erred. In granting exemptions under Section 903(e) (2), accomplishment of the aims of the National Transportation Policy is not set forth as a consideration upon which the Commission should grant an exemption.

█ The essential finding here is whether the exemption of the transportation applied for was actually and substantially competitive with transportation by common carriers subject to part I, II or III of the Act. The Commission found it was not because of the requirement of special equipment or shipment in bulk. The report discloses ample facts to substantiate this finding. The Commission did not act arbitrarily or capriciously. Nothing more was necessary to the validity of its order.

There are cases with statements to the effect that all relevant factors of the National Transportation Policy must be at least considered in every proceeding of the Commission,[34] or the National Transportation Policy must serve as a guide to the Commission in all its decisions.[35] However, these statements are found in

27. 49 U.S.C.A. § 903(e) (1) and (e) (2).

28. 49 U.S.C.A. § 903(g); see, Section 903(l).

29. 49 U.S.C.A. § 903(b), (c) and (d).

30. 49 U.S.C.A. § 903(e) (1) and (g).

31. 49 U.S.C.A. § 903(e) (2).

32. 49 U.S.C.A. § 903(b). (c) and (d).

33. 49 U.S.C.A. § 903(e) (1), (e) (2) and (g).

34. See Cantlay & Tanzola, Inc., v. United States, D.C.S.D.Cal.1953, 115 F.Supp. 72.

35. See Luckenbach S.S. Co. v. United States, D.C.S.D.N.Y.1954, 122 F.Supp. 824.

**630**

cases arising under the rate provisions of the Act or in connection with the granting of a certificate of convenience and necessity. These statements are not found in cases dealing with exemptions from regulations under Section 903(e) (2) of the Act.

The motion to dismiss the complaint of the plaintiff, Seatrain, is granted. An order in accordance herewith may be submitted.